# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SALLIE BOOTH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:09cv2131 (MRK) |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF DEVELOPMENTAL | : | |
| SERVICES, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION

On December 30, 2009, Plaintiff Sallie Booth filed a Complaint [doc. # 1] alleging illegal retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, against Defendant State of Connecticut, Department of Developmental Services ("DDS"). Ms. Booth alleges DDS subjected her to a continuing pattern of harassment and unequal treatment from April 22, 2008 through the present in retaliation for her Connecticut Commission on Human Rights and Opportunities ("CHRO") complaint. As a result, Ms. Booth claims that she has suffered economic losses and emotional distress. For the reasons set forth in greater detail below, the Court GRANTS DDS's Motion for Summary Judgment [doc. # 32].

## I.

The Court assumes the parties' familiarity with the factual and procedural background of this case and will therefore only briefly discuss those facts relevant to this opinion. These facts are culled from the parties' Local Rule 56(a) statements, affidavits, and exhibits attached to their

respective memoranda. Unless otherwise indicated, all of the facts recited below are undisputed. Unfortunately, the numerous inconsistencies within the parties' submissions have made compiling an accurate description of the facts more of a hope than a reality. Where such inconsistencies were material or genuine, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), the Court resolved them in Ms. Booth's favor, *see Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000).

Sallie Booth is an African American. DDS is a Connecticut agency, an employer within the meaning of the relevant statutes, and at all relevant times it employed more than one hundred individuals. Ms. Booth has been employed by DDS since June 23, 1986. In the past, she has held the position of Mental Retardation Worker 2 ("MRW2").[1] During her stint as a MRW2, she served for a few months in 1990 as a temporary Lead (a higher position). As a result of an incident in 2001, Ms. Booth was demoted to a MRW1 position. Ms. Booth is currently employed as a Departmental Services Worker 1 ("DSW1"). Ms. Booth applied for and did not receive promotional opportunities in November 2001 and February 2002. On March 21, 2007, Ms. Booth's union filed a grievance seeking to have Ms. Booth reclassified as a MRW2.

Sometime in early November 2007, Ms. Booth and coworkers Kerrie Kelly and Karen Gorra had a falling out ("the November incident"). Parties disagree about whether Ms. Booth submitted numerous verbal complaints regarding Ms. Kelly in the fall of 2007.

---

[1] In July 2008, the agency's name changed from the Department of Mental Retardation to the Department of Developmental Services. "Mental Retardation Worker" or "MRW" and "Developmental Services Worker" or "DSW" are therefore used interchangeably. Level 1 and Level 2 are different pay and responsibility grades. There are multiple possible shifts any worker may be assigned to, and a worker at any level may be full-time or part-time.

The parties agree that Ms. Booth filed a complaint against Ms. Kelly in November 2007, *see* Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 4, but Ms. Booth also seems to argue that she did not file an internal discrimination complaint with DDS until February 2008, *see* Pl.'s Mem. in Opp'n [doc. # 33] at 2 (stating that the internal complaint was filed *after* she received the January 2008 Letter of Warning). There is some evidence in the record that a November complaint was actually filed by Ms. Kelly against Ms. Booth. *See* Def.'s Ex. [doc. # 32-4] 1:17 (Memorandum to Kerrie Kelly) ("The investigation regarding your (11-13-07) allegation of being targeted and harassed by your co-workers has recently been completed."). Regardless, DDS commenced an internal investigation in the fall of 2007.

A MRW2 position, created when another employee was terminated, was downgraded on November 21, 2007 to a MRW1 full-time second shift position before it was posted on December 7, 2007. Ms. Booth did not apply for the downgraded position.

As a result of DDS's internal investigation, Ms. Booth received a Letter of Warning dated January 14, 2008 regarding the November incident. This letter was presented to Ms. Booth in early February 2008. The letter begins:

> On November 8, 2007, you left the following message on Kerrie Kelly's cell phone while you were on duty at Seaview [Apartments] . . .
>
> > Pick up your darn phone. Call me back and stop texting people, you fucking child you. Face the maker. Don't nobody want to wheel and deal at work. Now if you want something you need to call the person who's buying it and deal with them direct.[2] Over and peace the flip out.

---

[2] The transaction referred to appears to be a sale of a day bed.

Def.'s Ex. [doc. # 32-5] 1:26. The letter notes that Ms. Booth violated DDS Work Rules 3, 4, and 5. *See id.* Ms. Gorra received a Letter of Direction dated January 14, 2008, noting that she violated DDS Work Rules 3 and 23. *See id.* Ms. Kelly received a memorandum dated January 31, 2008, noting that she violated DDS Work Rule 3. *See id.* Ms. Booth filed a union grievance form dated February 8, 2008 concerning her Letter of Warning.

On February 5, 2008, Ms. Booth alleged that Ms. Kelly made racially derogatory remarks. DDS sent Ms. Booth a letter dated February 14, 2008 stating it was commencing an investigation. Len Erazmus—the DDS investigator in the internal investigation of racial discrimination and sexual harassment—sent Ms. Booth a letter dated April 16, 2008 informing her that there was insufficient evidence to support her allegations. The only evidence of any potentially problematic text messages was presented by Ms. Gorra, who attempted to describe one text message she had seen on Ms. Booth's phone, allegedly sent by Ms. Kerry: "It was an extremely nasty message regarding Cinderella & Pinocchio noise [sic] every time he lies his noise [sic] grow larger and at the end it said Cinderella told Pinocchio lie fucker lie. It was similar to that –" Pl.'s Ex. [doc. # 35] D.

On April 14, 2008, Ms. Booth filed a complaint against DDS with the CHRO and the EEOC alleging discrimination and retaliation on the basis of race and age from 1987 through the end of 2007. In the CHRO complaint, Ms. Booth alleged that, due to her race and age, DDS allowed Ms. Booth to be subjected to harassment at work and denied her promotional opportunities. *See* Def.'s Ex. [doc. # 32-4] 1:12. DDS was formally notified of Ms. Booth's CHRO complaint by a letter dated April 22, 2008. On April 29, 2010, the CHRO dismissed Ms.

Booth's first CHRO complaint, having found that there was no reasonable cause for believing that a discriminatory act occurred.

On April 24, 2008, a hearing was held by a DDS reclassification panel on the union-filed March 2007 grievance seeking reclassification for Ms. Booth. On May 9, 2008, the DDS reclassification panel denied the union-filed grievance. Based on testimony, the panel found that Ms. Booth works alone less than 50% of the time and only on rare occasions serves in a lead capacity. *See* Def.'s Ex. [doc. # 32-4] 1:11. Because the MRW2 job specification states that "This class is to be used where the incumbent works alone at least 50% of the time or leads subordinates on a regular and continuing basis," the panel unanimously voted to deny the grievance. *Id.*

Ms. Booth applied for two DSW2 positions on June 9, 2008. DDS maintains that the first position, at Seaview Apartments, was awarded to a lateral transfer in accordance with District 1199's Collective Bargaining Agreement. The parties agree that, based on her position, Ms. Booth was not eligible to be transferred to the Seaview Apartments DSW2 position. The second position was at Church Street Mystic. This position was subsequently rescinded. In a Supplemental Affidavit of Jennifer Green [doc. # 42-1], filed by DDS after oral argument, DDS offers a number of reasons explaining why the position was rescinded and why, even had it not been rescinded, the position would not in all likelihood have been awarded to Ms. Booth. These reasons are discussed in more detail below. On October 9, 2008 and October 13, 2008, Ms. Booth applied for two more DSW2 positions. The parties agree that both positions were awarded to others in accordance with District 1199's Collective Bargaining Agreement.

On September 15, 2008, Ms. Booth filed a second CHRO complaint against DDS, alleging retaliation. On January 8, 2009, a CHRO investigator determined that there was "No Reasonable Possibility that further investigation would lead to a finding of Reasonable Cause" and dismissed Ms. Booth's second CHRO complaint.

On March 16, 2009, DDS and Ms. Booth's union signed a stipulated agreement. It provided that the January 2008 Letter of Warning would be reduced to a Letter of Direction, the Letter would not be cited in Ms. Booth's 2008-09 service rating, and that Ms. Booth would withdraw all grievances, complaints, lawsuits, and other legal and administrative actions based on the same facts giving rise to the grievance (the November incident).

Ms. Booth received a Letter of Direction dated June 29, 2009 because she failed to report for a scheduled overtime shift. The Letter noted that she would therefore not be allowed to work voluntary overtime between July 17 and July 30, 2009. Ms. Booth admitted that she failed to report for the shift.

On July 15, 2009, Ms. Booth was placed on administrative leave with pay, pending an investigation into allegations of abuse made by a DDS resident.[3] *See* Def.'s Ex. [doc. # 32-5] 1:30. According to Ms. Booth, this resident had a mental disability and a known history for lying. *See* Def.'s Ex. [doc. # 32-5] 1:31 ¶ 14. While Ms. Booth was out on leave, another patient—whom Ms. Booth alleges had similar behavioral and psychological issues—accused Ms. Booth of abuse. *See id.* ¶ 15. A DDS investigation found the charges unsubstantiated, and Ms. Booth returned to work on September 9, 2009. *See id.* ¶ 17. Ms. Booth claims to have been on leave for a total of seven weeks. *See* Pl.'s Mem. in Opp'n [doc. # 33] at 3. As a result of the leave,

---

[3] Ms. Booth also states that she was informed that she was being placed on "paid suspension" on August 5, 2009. Def.'s Ex. [doc. # 32-4] 1:31 ¶ 14.

Ms. Booth alleges that she was deprived of any overtime work opportunities for approximately two months. *See* Pl.'s Ex. [doc. # 35] A ¶ 10. However, as a result of her missing the overtime shift and therefore being barred from volunteering for overtime through July 30, 2009, *see* Def.'s Ex. [doc. # 32-5] 1:25, Ms. Booth was actually denied voluntary overtime work opportunities only for the July 31–September 9 period (slightly over five weeks).

Ms. Booth filed a third CHRO complaint on September 14, 2009, alleging that she was discriminated against when placed on administrative leave and that this action constituted continuing retaliation for her April 2008 CHRO complaint. She also reiterated allegations from her first CHRO complaint. DDS responded by referring CHRO to DDS's responses to the first CHRO complaint and denying that its actions constituted retaliation. On January 28, 2010, after the Merit Review Assessment for the third CHRO complaint, the CHRO determined that there was no reasonable possibility that further investigation would result in a finding of reasonable cause.

Ms. Booth received a number of written reprimands after December 2007. *See* Def.'s Exs. [doc. # 32-5] 1:21-23. Her evaluations remained mostly positive, *compare* Pl.'s Ex. [doc. # 35] E, *with* Pl.'s Ex. [doc. # 35] G, and she does not appear to have been otherwise disciplined for the aforementioned or other incidents.

On November 3, 2009, Ms. Booth obtained a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission ("EEOC"). She filed a Complaint [doc. # 1] with this Court on December 30, 2009. On March 28, 2011, DDS filed a Motion for Summary Judgment [doc. # 32]. Ms. Booth filed her Memorandum in Opposition [doc. # 33] on April 18, 2011, and after receiving an extension of time, DDS filed its Reply [doc. # 40] on June 1, 2011. After oral

argument on July 18, 2011, DDS filed the Supplemental Affidavit of Jennifer Green [doc. # 42-1]. Ms. Booth did not respond to the supplemental affidavit by the deadline provided by the Court.

## II.

Although the CHRO's findings are included in the record and its conclusions are mentioned in the above statement of facts, the Court relies only on the underlying evidence in reaching its decision. There is therefore no need to address Ms. Booth's contention that the findings of administrative agencies are not admissible.

Finally, the Court acknowledges that Ms. Booth's Local Rule 56(a)(2) statement includes conclusory allegations, many of which are not supported by the record. However, as the Court relies only on the underlying evidence when there is disagreement between the parties' Local Rule 56(a) statements and evaluates factual disputes in the analysis, DDS's request that certain portions of Ms. Booth's statement of facts be stricken is moot. *See Barlow v. State of Conn., Dep't of Pub. Health*, 319 F. Supp. 2d 250, 259 (D. Conn. 2004) ("In deciding a summary judgment motion . . . it is necessary to look to the record evidence, and inappropriate to rely solely on the 56(a)(2) statement." (citing *Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003))).

## III.

This Court applies a familiar standard when resolving a motion for summary judgment. Summary judgment is appropriate only when the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials" submitted to the Court "show[ ] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(a). A "material fact" is one whose resolution will affect the ultimate determination of the case. *See Anderson*, 477 U.S. at 248. A factual dispute is "genuine" when the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *See id.*; *see also Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub*, 202 F.3d at 178 (quotation marks omitted). However, the party against whom summary judgment is sought cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts," and instead "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n. 11 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Second Circuit has cautioned that district courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and quotation marks omitted). However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a

motion for summary judgment." *Id.* "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quotation marks omitted).

## IV.

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." [4] *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). As in discrimination claims, after a *prima facie* case is made, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action, which then returns the burden to the plaintiff to demonstrate that the proffered reason is a mere pretext for unlawful retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Cunningham v. New York State Dep't of Labor*, No. 10-2163-cv, 2011 WL 1837674, at *1 (2d Cir. May 16, 2011).

Title VII discrimination and retaliation claims have distinct standards for adverse employment actions. *See Cunningham v. New York State Dept. of Labor*, 326 Fed. App'x 617, 620-21 (2d Cir. 2009) (summary order) (noting that the former require "materially significant disadvantage[s] with respect to the terms of [plaintiff's] employment," while the latter depend "upon the circumstances of the particular case, and should be judged from the perspective of a

---

[4] The Second Circuit sometimes articulates three, rather than four, elements of the Title VII *prima facie* case for retaliation. *See, e.g.*, *Richardson v. Comm. on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008).

reasonable person in the plaintiff's position" (quotation marks and citations omitted) (alterations in original)). The Supreme Court has held that the anti-retaliation provision of Title VII "covers those (and only those) employer actions that would have been materially adverse to the reasonable employee or job applicant. . . . [T]hat means that a employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006). In determining whether an alleged act of retaliation rises to the level of an adverse employment action, "[c]ontext matters," since "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships . . . ." *Id.* at 69 (quotation marks omitted).

Ms. Booth argues (1) that she was reprimanded more harshly than white coworkers for the November incident; (2) that DDS denied her promotions by rescinding promotional opportunities after she submitted applications for the positions; (3) that she was placed on paid administrative leave for an excessive period of time based on unsupportable allegations that she abused clients; and (4) that she has been subjected to harassment and unequal treatment, which manifested in disciplinary actions and unjustified unfavorable evaluations.

For all of these allegations, Ms. Booth has offered evidence that she was opposing unlawful discrimination and that DDS was aware of her actions, meeting the first two requirements for establishing a *prima facie* case of discrimination. However, her arguments falter at later stages in the analysis, as described below.

**A.**

Ms. Booth may be able to make out a *prima facie* claim based on her first allegation of retaliation. After the DDS investigation regarding the November incident concluded, Ms. Booth received a Letter of Warning noting that she violated DDS Work Rules 3, 4, and 5. *See* Def.'s Ex. [doc. # 32-5] 1:26. After Ms. Booth filed a grievance and her union representatives met with DDS, the Letter of Warning was later reduced to a Letter of Direction, and it does not appear that Ms. Booth was otherwise disciplined. *See* Def.'s Ex. [doc. # 32-5] 1:37. Meanwhile, Ms. Gorra received a Letter of Direction noting that she violated DDS Work Rules 3 and 23. *See* Def.'s Ex. [doc. # 32-5] 1:26. Ms. Kelly received a memorandum noting that she violated DDS Work Rule 3. *See id.*

A reasonable jury could decide that a letter of reprimand would deter a reasonable employee from exercising his rights:

> A formal reprimand issued by an employer is not a "petty slight," "minor annoyance," or "trivial" punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy. A reasonable jury could conclude as much even when, as here, the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently.

*Millea v. Metro-North R.R. Co.*, --- F.3d ---, 2011 WL 3437513, at *6 (2d Cir. 2011).

Ms. Booth implies that she received the Letter of Warning *because* she complained about Ms. Kelly (and that Ms. Gorra received the Letter of Direction *because* she filed a statement supporting Ms. Booth's allegations of racial and sexual harassment). *See* Pl.'s Mem. in Opp'n [doc. # 33] at 8 (noting that Ms. Booth received a Letter of Warning after complaining about Ms. Kelly); Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 5 (same); *but see* Pl.'s Mem. in Opp'n

[doc. # 33] at 2 (alleging that Ms. Booth made an internal discrimination complaint regarding Ms. Kelly's alleged harassment because Ms. Booth had received a Letter of Warning); Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 38 (stating that Ms. Booth was "forced to file a grievance"—which eventually resulted in her Letter of Warning being reduced to a Letter of Direction—because in receiving a Letter of Warning she was treated differently than the Caucasian employees). Interpreting these contradictory allegations in the light most favorable to Ms. Booth, the Court assumes that she has stated a *prima facie* case for retaliation under Title VII.

Nonetheless, this retaliation claim cannot survive a motion for summary judgment. Insofar as the letters clarify that the three women violated different types and different numbers of work rules, DDS has implicitly offered a legitimate business reason for the distinctions between the communications. Ms. Booth has not produced any evidence that the disparity in reprimands was due to her actions rather than the fact that she was found to have violated more Work Rules than either of her coworkers. Given this, no reasonable jury could find that Ms. Booth suffered from unlawful retaliation based on this allegation. *See Anderson*, 477 U.S. at 248.

## B.

Ms. Booth's second allegation is that DDS retaliated against her by denying and rescinding promotional opportunities after Ms. Booth submitted an application. As she either admits that most of the positions for which she applied were appropriately awarded to others or cannot contest the legitimate business reasons DDS provides for the alteration of others, Ms. Booth's argument rests solely on the Church Street Mystic position. Ms. Booth applied for this position on June 9, 2008, and it was subsequently rescinded. Ms. Booth made much of the fact

that DDS provided no legitimate business reason for this rescission. *See* Pl.'s Mem. in Opp'n [doc. # 33] at 2; Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 18.

However, in a Supplemental Affidavit of Jennifer Green [doc. # 42-1], filed by DDS after oral argument, DDS offered a number of reasons explaining why Ms. Booth's allegations of retaliation based on this rescission fail. First, the residential manager of the Church Street Mystic house requested the rescission, as she determined that the position was not needed. This resulted in the position being reposted for a different location. Second, there were twenty-six individuals who applied for the Church Street Mystic position. Of these, a number were DSW2 employees who had transfer priority under the District 1199 Collective Bargaining agreement and would have been given the job before it was offered to Ms. Booth. Finally, there were eleven applicants for the reposted Shore Road position, three of whom were also DSW2 employees with similarly prioritized lateral transfer rights, and the position was ultimately awarded to a DSW2 employee. Ms. Booth did not respond to the supplemental affidavit by the deadline provided by the Court.

Even if Ms. Booth can demonstrate that the Church Street Mystic rescission constituted a materially significant disadvantage, making it an adverse employment action for purposes of establishing a *prima facie* Title VII retaliation claim—a conclusion this Court does not endorse, *see Burlington Northern*, 548 U.S. at 57—Ms. Booth has not offered any evidence demonstrating that DDS's legitimate business reason for rescinding the Church Street Mystic position was merely pretextual. A reasonable jury could not therefore find that Ms. Booth met her burden of establishing a claim. *See Anderson*, 477 U.S. at 248.

## C.

Turning to the third allegation, it is clear that a reasonable jury would not find that placement on paid administrative leave constitutes an adverse employment action for purposes of a Title VII retaliation claim when an internal investigation is pending. *See Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006) (noting that four other Circuits have determined that placement on paid administrative leave during the pendency of an internal investigation does not constitute an adverse employment action and holding that placement on paid administrative leave pending the determination of criminal charges also did not constitute an adverse employment action); *Cooper v. Conn. Dep't of Corr.*, No. 3:09cv691 (MRK), 2010 WL 4345715, at *10 (D. Conn. Oct. 19, 2010) (finding that mandatory paid administrative leave was a reasonable application of preexisting disciplinary policy—and therefore was not an adverse employment action—because it was only for two months, the plaintiff was allowed to immediately return to his position, and the plaintiff suffered no changes in his employment status).

Again, even assuming *arguendo* that Ms. Booth can make out a *prima facie* claim based on this allegation, Ms. Booth's claim cannot survive a motion for summary judgment. DDS has provided a legitimate business reason for Ms. Booth's placement on paid administrative leave: namely, that there had been colorable allegations that she had abused clients. Aside from conclusory claims that the clients' allegations were baseless and that DDS should have known that they were baseless, Ms. Booth has not offered any evidence demonstrating that DDS's legitimate business reason for putting her on paid leave was pretextual.

Moreover, the length of time between Ms. Booth's protected actions (the April and September 2008 complaints) and the alleged retaliation (the July 2009 paid administrative leave)

was more than one year and ten months, respectively. Although a plaintiff can prove causation indirectly "by showing that the protected activity was closely followed in time by the adverse action," *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988), the time lapse here between the protected activity and alleged retaliation is too great to support such an inference, *see, e.g.*, *Kodengada v. I.B.M. Corp.*, No. 00-7434, 2000 WL 1786346, at *3 (2d Cir. Dec. 4, 2000) (finding that a five-month interval was too long to support a causation argument without other probative evidence). Therefore, no reasonable jury would find in Ms. Booth's favor on her claim that her placement on paid administrative leave was illegal retaliation. *See Anderson*, 477 U.S. at 248.

## D.

Lastly, assuming that Ms. Booth may be able to make out a *prima facie* case with regard to her fourth allegation—that she has been subjected to harassment and unequal treatment, which manifested in disciplinary actions and unjustified unfavorable evaluations—this argument also cannot survive a motion to dismiss. DDS has provided a legitimate business reason for each written reprimand it sent Ms. Booth, *see* Def.'s Exs. [doc. # 32-5] 1:21-23, 26, and Ms. Booth has offered no evidence that these reasons are merely pretextual. In fact, Ms. Booth often admits to the behavior that resulted in the various Letters. Furthermore, Ms. Booth's evaluations remain mostly positive, *compare* Pl.'s Ex. [doc. # 35] E, *with* Pl.'s Ex. [doc. # 35] G, and she does not appear to have been otherwise disciplined. Because she provides no evidence that the Letters and less favorable evaluations were merely pretextual, a reasonable jury could not find that Ms. Booth's retaliation claim on this basis would survive a motion to dismiss. *See Anderson*, 477 U.S. at 248.

**E.**

Because Ms. Booth has either not met her threshold burden of showing a *prima facie* Title VII retaliation claim or has not produced evidence demonstrating that DDS's legitimate business reasons for differential treatment are merely pretextual, DDS's Motion for Summary Judgment [doc. # 32] should be GRANTED.

**V.**

Although Ms. Booth does not state an unlawful discrimination claim, and although her counsel stated at oral argument that she was only arguing a retaliation claim, the parties' briefs often implicitly assume that a discrimination claim is before the Court. Given this confusion, the Court interprets Ms. Booth's complaint to allege a complaint of discrimination and finds that such a claim would also fail to survive a motion for summary judgment.

Title VII prohibits discrimination with respect to an individual's "compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish illegal discrimination by demonstrating that membership in a protected class "was a motivating factor for any employment practice,e ven though other factors also motive the practice." 42 U.S.C. § 2000e-2(m); *see Raytheon Co. v. Hernandez,* 540 U.S. 44, 52 (2003) (finding that employer liability in disparate-treatment cases depends on if the protected trait motivated the employer's decision). A Title VII plaintiff may use circumstantial evidence to prove discrimination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99-100 (2003).

Ms. Booth has three possible allegations of discrimination: (1) that she has suffered from race-based harassment from a coworker and that DDS did not take adequate steps to prevent it (which the Court construes as a hostile work environment claim); (2) that she was reprimanded more harshly than white coworkers for the November incident; and (3) that DDS denied her promotions by rescinding promotional opportunities after she submitted applications for the relevant positions.

## A.

With regard to the first possible allegation, Ms. Booth does not offer evidence that her supervisors harassed her based on her race. Even if the Court construes Ms. Booth's allegation liberally as a hostile work environment claim and views the totality of the circumstances in the light most favorable to her, no reasonable jury could find that her work environment was objectively hostile or abusive.

"In order to prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quotation marks omitted). "Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Id.* at 150. "A hostile work environment claim is composed of a series of separate acts that collectively constitute 'one unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e–5(e)(1)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.*

Ms. Booth has provided only sparse and largely conclusory allegations of incidents of harassment. Although the issue was not raised before this Court, it is worth noting that, in her complaint to the CHRO, Ms. Booth alleged that Ms. Kelly said**,** "Black women don't phase [sic] me" and "I'm not afraid of niggers." Def.'s Ex. [doc. # 32-4] 1:12 ¶ 8. The only actual evidence of any harassment before this Court was Ms. Gorra's description of a text message with inappropriate sexual (but not racial) subject matter. *See* Pl.'s Ex. [35] D. The parties disagree as to whether Ms. Booth submitted numerous verbal complaints alleging that Ms. Kelly made derogatory and racist remarks prior to the written complaint she submitted in November 2007. Ms. Booth has produced scant evidence that she made complaints regarding Ms. Kelly making derogatory remarks prior to the November 2007 internal complaint.

While not in any way intending to condone Mr. Kelly's various alleged remarks—which, if uttered, were inappropriate and should not be tolerated in any workplace—the Court determines that Ms. Booth's claim cannot survive a motion for summary judgment. Given the scarcity of evidence, no reasonable jury would find that Ms. Booth had submitted numerous verbal complaints about Ms. Kelly prior to November 2007. *See Parker v. Sony Pictures Entm't*, 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" (quoting *Celotx Corp. v. Catrett*, 477 U.S. 317, 324 (1986))); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Nor would a reasonable jury find that Ms. Booth had been subject to severe and pervasive racial harassment. While the Second Circuit has commented that "a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace," *Feingold*, 366 F.3d at 150 (quotation marks and alterations omitted), Ms. Booth has not described any incident or act that worked such a alteration. The Second Circuit has also noted that "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." *Schwapp*, 118 F.3d at 110 (quotation marks omitted). That is a standard that Ms. Booth has not met. Therefore, no reasonable jury could find Ms. Booth's workplace was objectively hostile and permeated with racial animus for Title VII purposes. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

Even if Ms. Booth did suffer from pervasive race-based harassment from her coworkers, she cannot demonstrate a specific basis for imputing the conduct creating the hostile work environment to DDS. *See Feingold*, 366 F.3d at 150. DDS immediately responded to internal complaints by launching internal investigations in November 2007 and February 2008. *See* Def.'s Ex. [doc. # 32-5] 1:15, 26. These investigations uncovered insufficient evidence to support Ms. Booth's allegations.[5] *See* Def.'s Ex. [doc. # 32-5] 1:16. Furthermore, because Ms. Booth does not provide any evidence that a supervisor harassed her based on her race, DDS cannot be held vicariously liable for Ms. Kelly's alleged remark or text messages. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) ("An employer is subject to vicarious liability to a victimized

---

[5] The parties disagree as to whether DDS's investigation of Ms. Booth's allegations of racial and sexual harassment reached the appropriate conclusion. Again, Ms. Booth has produced little relevant evidence. Given this record, it is unlikely that a reasonable jury would find that DDS's investigation of Ms. Booth's allegations did not reach an appropriate conclusion. *See Williams*, 453 F.3d at 116.

employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").

## B.

Title VII race-based employment discrimination claims based on disparate treatment are governed by the now-familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. A plaintiff may establish a *prima facie* case of discrimination by showing that: "1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). An adverse employment action for the purposes of a Title VII discrimination claim is must constitute "'a materially significant disadvantage with respect to the terms of [plaintiff's] employment.'" *La Grande v. DeCrescente Distributing Co., Inc.*, 370 Fed. App'x 206 (2d Cir. 2010) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)); *see also Cunningham*, 326 Fed. App'x at 620-21 (differentiating definitions of "adverse employment actions" under Title VII discrimination and retaliation claims).

After the plaintiff makes out a *prima facie* case by a preponderance of the evidence, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the adverse action. *See Norville*, 196 F.3d at 95. "The burden is satisfied if the employer articulates a clear and specific reason which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Gladwin v. Pozzi*, 403 Fed. App'x 603, 606 (2d Cir. 2010) (quotation marks omitted). If the defendant does so, "the burden shifts back to [the] plaintiff who must prove that a discriminatory reason was the actual reason for the employment

action." *Id.* "'Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)).

Ms. Booth could have made two claims of disparate treatment based on race: (1) that she was reprimanded more harshly than her white coworkers, and (2) that she was denied promotions based on her race.

## 1.

Ms. Booth may be able to make out a *prima facie* case of racially-based disparate treatment based on her allegation that she was reprimanded more harshly than her white coworkers for the November incident. As described above, the three women involved in the November incident received different levels of chastising letters. *See* Def.'s Ex. [doc. # 32-5] 1:26.

Ms. Booth has established that, as an African American, she is a member of a protected class and thus meets the first requirement for establishing a *prima facie* disparate treatment case. By demonstrating that she once had held an equivalent position and that she has recently received positive evaluations, Ms. Booth has provided some evidence to support the claim that she was qualified for the DSW2 position, possibly meeting the second requirement. Some unequal reprimands might qualify as an adverse employment action for the purposes of a Title VII discrimination claim. *See Lawrence v. Mehlman*, 389 Fed. App'x 54, 56 (2d Cir. 2010) (finding that "[r]eprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action, and whether they do is typically a question of fact for the jury" but

ultimately concluding that a reasonable jury would not find that an unpublicized reprimand withdrawn after six weeks "sufficiently affected the terms and conditions of [the plaintiff's] employment to constitute an adverse employment action" (citations omitted)). Although Ms. Booth has failed to produce written evaluations of her coworkers demonstrating that the reprimands were doled out unequally, the Court assumes without deciding that Ms. Booth has produced evidence that the other two coworkers are similarly situated. *See Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (For the fourth element of the *prima facie* case, "[a] plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (quotation marks omitted)). Reading the record in favor of the non-moving party, the Court finds that Ms. Booth might be able to make out a *prima facie* case for Title VII discrimination.

However, Ms. Booth offers no evidence that DDS's legitimate business reason—that the three women violated different and different numbers of work rules—is pretextual. Because she does not carry her burden of proof, no reasonable jury could find that Ms. Booth suffered from disparate treatment based on this allegation. *See Anderson*, 477 U.S. at 248.

**2.**

As already noted above, Ms. Booth made much of the fact that DDS originally provided no legitimate business reason explaining why a promotional opportunity position was rescinded. *See* Pl.'s Mem. in Opp'n [doc. # 33] at 2; Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 18. Ms. Booth alleges that this resulted in her failing be promoted. *See* Pl.'s Mem. in Opp'n [doc. # 33] at 2.

The Supreme Court has provided a specific framework for a Title VII *prima facie* claim based on failure to promote:

> plaintiff must allege that (1) she is a member of a protected class; (2) she "applied and was qualified for a job for which the employer was seeking applicants"; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). Even assuming that Ms. Booth meets the first three requirements, because all parties agree that the position did not remain open and that the employer did not continue seeking applicants, Ms. Booth fails to meet the fourth requirement and therefore fails to state a *prima facie* claim. *See Roncallo v. Silkorsky Aircraft Corp.*, No. 3:09CV126 (MRK), 2010 WL 4365764 (D. Conn. Oct. 22, 2010) (thoroughly analyzing a similar claim).

Furthermore, as discussed above, DDS has supplemented the record by filing the Supplemental Affidavit of Jennifer Green [doc. # 42-1], which provides a legitimate business reason for the rescission. Therefore, based on the record before it, even if Ms. Booth had stated a *prima facie* case for failure to promote based on race, she has not demonstrated that DDS's discrimination was the actual reason for its action. *See Gladwin*, 403 Fed. App'x at 606. This claim would therefore not survive a motion for summary judgment, as no reasonable jury could find in Ms. Booth's favor on a failure to promote claim based on the Church Street Mystic rescission. *See Anderson*, 477 U.S. at 248.

Although Ms. Booth does not clearly allege that she believes she lost her reclassification appeal because of her race, she implies that it may have played a role in the panel's decision. *See* Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 6. On May 9, 2008, the DDS reclassification panel denied the union-filed grievance. *See* Def.'s Ex. [doc. # 32-4] 1:10. The panel found, based

on testimony, that Ms. Booth works alone less than 50% of the time and only on rare occasions serves in a lead capacity. *See* Def.'s Ex. [doc. # 32-4] 1:11. Because the MRW2 job specification states that "This class is to be used where the incumbent works alone at least 50% of the time or leads subordinates on a regular and continuing basis," the panel unanimously voted to deny the grievance. *Id.* Ms. Booth maintains that she met the requirements for the job, as she "had been standing in as a Lead for years on her shift." Pl.'s Local Rule 56(a)(2) Statement [doc. # 34] ¶ 6 (citing Pl.'s Ex. [doc. # 35] C (job description)); *see also* Pl.'s Ex. [doc. # 35] E (evaluation stating that Ms. Booth has continued to take the lead in lieu of her title). Interpreting the facts in a light most favorable to Ms. Booth, she may be able to argue that the denial of her reclassification was an adverse employment action and that the circumstances may give rise to the implication that it was based on her race.

Even assuming *arguendo* that Ms. Booth has produced sufficient evidence to establish that this denial of reclassification constituted a *prima facie* case of Title VII discrimination, she has not offered any evidence that the denial was merely pretextual rather than panel's finding that she did not meet the requirements for the position. *See Tex. Dep't of Cmty. Affairs v. Budine*, 450 U.S. 248, 259 (1981) (noting that even if "a court may think that the employer misjudged the qualifications of the applicants," the employer is not exposed to Title VII liability). Again, this claim would not survive a motion for summary judgment, as no reasonable jury could find in Ms. Booth's favor on a failure to promote claim based on her lack of success with the reclassification panel. *See Anderson*, 477 U.S. at 248.

## C.

In conclusion, Ms. Booth either has not met her threshold burden of showing a *prima facie* Title VII discrimination claim or has not produced evidence demonstrating that DDS's legitimate business reasons for differential treatment are merely pretextual. As a result, none of these discrimination claims can survive a motion for summary judgment.

## VI.

DDS's Motion for Summary Judgment [doc. # 32] is GRANTED. **The Clerk of Court shall enter judgment in accordance with this Order and close the file.**

**IT IS SO ORDERED.**

/s/     Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: **August 16, 2011.**